IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**COURTNEY GOODSON and**                                         **PLAINTIFFS**
**COURTNEY GOODSON CAMPAIGN**

v.                        **CASE NO. 4:18-CV-00791 BSM**

**REPUBLICAN STATE LEADERSHIP COMMITTEE**
**– JUDICIAL FAIRNESS INITIATIVE**                                 **DEFENDANT**

**ORDER**

Based on the October 31, 2018, hearing and the entire record, plaintiffs' motion for a preliminary injunction [Doc. No. 2] is denied.

I. BACKGROUND

Plaintiff Courtney Goodson, an Associate Justice of the Arkansas Supreme Court, is seeking reelection. Compl. ¶¶ 1, 4, Doc. No. 2. David Sterling is challenging her, and the election is on November 6, 2018. *Id.* ¶ 4. Defendant Republican State Leadership Committee–Judicial Fairness Initiative ("RSLC–JFI") is an independent expenditure committee that opposes Goodson and supports Sterling. *See id.* ¶¶ 3, 5; Def.'s Br. Opp'n at 1, Doc. No. 11. Goodson complains that RSLC–JFI is disseminating defamatory campaign advertisements. Compl. ¶ 3.

Specifically, Goodson takes issue with a television advertisement and a campaign mailer created by RSLC–JFI. *Id.* The television advertisement states that "Courtney Goodson took a $50,000 trip to Italy on a donor's yacht. And hundreds of thousands in contributions from law firms [that] go before her Court. Huge gifts from donors. How can

she be fair? Reject Scandal. Reject Courtney Goodson." *Id.*; Pl. Hr'g Ex. 3. The campaign mailer contains the following text:

> Most Arkansans don't get free $50,000 vacations to Italy paid for by trial attorneys, but Supreme Court Justice Courtney Goodson did. An ultra-wealthy Arkansas trial lawyer and campaign donor paid for Courtney Goodson and her husband to go on an extended luxury vacation to Italy, including a cruise on a yacht owned by one of her corporate campaign contributors.
>
> Then, Goodson turned to Arkansas taxpayers to support her lavish lifestyle by asking for an additional $18,000 pay raise. Courtney Goodson was already paid almost $150,000 a year when she received a $16,000 pay raise in 2015, making her one of the highest paid officials in Arkansas with a salary even bigger than the Governor's. In 2017, Goodson requested another pay raise of $18,000.
>
> If Courtney Goodson gets lavish trips, what do the trial lawyers get from Courtney Goodson? On the Supreme Court, Goodson consistently sides with the trial lawyers, issuing legal opinions that make them millions more in their lawsuits.

Compl. Ex. A; Pl. Hr'g Ex. 4. The mailer also has a large caption that reads, "The Scandalous Insiders," and it features two large photos of Goodson, including one of her holding what appears to be a glass of champagne against an Italian backdrop with a yacht in the background. Pl. Hr'g Ex. 4. The mailer further asserts that Goodson is "Living a Lavish Lifestyle That Is Bankrolled by Trial Attorneys" and that she "won't stand up for everyday Arkansans." *Id.* It advises voters to "[s]top her [on] November 6, 2018," and includes quotations from the Washington Post and the Arkansas Democrat-Gazette newspapers. *Id.*

Broadly speaking, there are two types of allegedly defamatory statements in these campaign advertisements. The first is RSLC–JFI's assertion that Goodson accepted various gifts, including a $50,000 trip to Italy and large campaign contributions from plaintiffs' law

firms. Based on the complaint and Goodson's testimony at the hearing, it is undisputed that she accepted a trip to Italy, which was a gift to Goodson and her husband from Goodson's personal friend and lawyer, W.H. Taylor. The record indicates that Goodson complied with the judicial ethics rules by timely disclosing the gift and by recusing from cases involving her husband and Taylor. *See* Pl. Hr'g Ex. 6. For these reasons, the Arkansas Judicial Discipline and Disability Commission, the commission tasked with investigating judicial misconduct, found that her acceptance of the trip was not improper. *Id.* Additionally, the hearing testimony confirmed that Goodson's campaign accepted contributions from plaintiffs' law firms. Nevertheless, judicial candidates are not permitted to personally solicit campaign contributions or even to know who has contributed to their campaigns, and Goodson testified that she followed these rules.

Although neither the television advertisement nor the mailer points to a specific ruling from Goodson that was influenced by a gift, this type of statement questions her impartiality and suggests that she is sympathetic to plaintiffs' lawyers. Goodson argues that this type of statement is false by implication or omission because she has recused from all cases involving her husband, Taylor, and from any law firm that has contributed to her campaign. *See* Compl. ¶ 3.

The second type of allegedly defamatory statement is RSLC–JFI's assertion that Goodson asked for an $18,000 pay raise. In her complaint, Goodson alleges this statement is false because she did not personally request a raise—rather, Chief Justice Dan Kemp

requested the raise on behalf of every member of the Arkansas Supreme Court after being authorized to do so by a vote of the Court. *See id.* ¶ 9. At the hearing, Goodson initially resisted answering whether she voted in favor of the pay raise. She testified that the Supreme Court's conferences are sacrosanct and that she did not want to violate the trust of the Court. Upon the request of defense counsel, Goodson was directed to answer, and she testified that she voted against the raise. This is the first time that she has publicly disclosed her vote.

Danyelle Walker, a member of the Arkansas Judicial Campaign Conduct and Education Committee's Rapid Response Team ("RRT"), also testified at the hearing. RRT acts as a watchdog over judicial elections and investigates charges of false or misleading judicial advertising. Walker testified that RRT received a complaint from Goodson's campaign alleging that RSLC–JFI was publishing defamatory statements about Goodson. RRT determined that the advertisements financed by RSLC–JFI were either false or misleading and requested that RSLC–JFI voluntarily withdraw them. Pl. Hr'g Ex. 5. RSLC–JFI responded in writing to RRT. Pl. Hr'g Ex. 7  In its response, RSLC–JFI wrote that RRT was a politically partisan organization, and that the advertisements are factually true. *Id.*

Goodson is seeking a preliminary injunction ordering RSLC–JFI to cease communicating and publishing these campaign materials through the election on November 6, 2018. *Id.* ¶ 42.

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008). Whether to grant such relief is within the sound discretion of the district court. *See Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006). A party seeking a preliminary injunction must prove that: (1) she will suffer irreparable harm if the injunction is denied; (2) the harm to the movant, if the injunction is denied, outweighs the harm to the non-movant if the injunction is granted; (3) there is a likelihood of success on the merits; and (4) an injunction is in the public's interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

## III. DISCUSSION

Goodson's motion is denied for two reasons: (1) granting a preliminary injunction would impermissibly restrain future speech, and (2) the record does not indicate that she is likely to succeed on the merits of her defamation claim.

### A. Restraining Future Speech

Enjoining RSLC–JFI from further communicating or publishing its campaign advertisements would amount to a constitutionally impermissible prior restraint on speech.

The First Amendment generally forbids the government, including the judiciary, "from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002). An injunction forbidding certain types of communications before they

are made is known as a "prior restraint." *Alexander v. United States*, 509 U.S. 544, 550 (1993); *McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015) ("'Prior restraint' is just a fancy term for censorship, which means prohibiting speech before the speech is uttered or otherwise disseminated."). A preliminary injunction would be a prior restraint on speech because it would stop RSLC–JFI from publishing its campaign materials, which is tantamount to restricting it from speaking.

Restraining future speech is almost always prohibited by the First Amendment. *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971); *Sindi v. El-Moslimany*, 896 F.3d 1, 31–32 (1st Cir. 2018). While prior restraints on speech are not unconstitutional *per se*, they may be imposed only to further "the essential needs of the public order," *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968), and are subject to the most exacting standard of review under the First Amendment, *Sindi*, 896 F.3d at 31–32. To pass such strict scrutiny, a prior restraint on speech must: (1) serve a compelling interest, (2) be "precisely tailored both to meet the exigencies of the particular case and to avoid censoring protected speech," and (3) be imposed only when there are not any less restrictive alternatives. *Id.* at 32.

Federal and state courts are divided as to whether prior restraints on defamatory statements violate the First Amendment. *See id.* at 30. Some take the position that, following a full trial on the merits, a narrowly-tailored permanent injunction is constitutionally permissible. *See, e.g.*, *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1208–09

(6th Cir. 1990) (Wellford, J., for the court in part); *Balboa Island Village Inn, Inc. v. Lemen*, 156 P.3d 339, 349 (Cal. 2007). Others are skeptical that it can ever be constitutional to prohibit defamatory speech that has not yet occurred. *See McCarthy*, 810 F.3d at 464–66 (Sykes, J., concurring); *Kinney v. Barnes*, 443 S.W.3d 87, 93–94 (Tex. 2014); *see also* Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157 (2007).

It appears wholly unprecedented, however, for a federal court to enter a *preliminary* injunction in a defamation case. In those defamation cases upholding the constitutionality of restraints on future speech, the injunctions were entered *after* the claims were adjudicated on the merits, and the injunctions were limited to the speech that was *actually found* to be defamatory by the fact-finder. *See, e.g.*, *Lothschuetz*, 898 F.2d at 1208–09 (Wellford, J., for the court in part); *see also McCarthy* 810 F.3d at 462–63 (majority opinion), 464–65 (Sykes, J., concurring). Only then can a court be satisfied that the restrained speech remains unprotected by the First Amendment. *See Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 311 (Ky. 2010).

In the absence of such a finding or judgment, Goodson wants to enjoin what could be protected speech, and this would be improper. Without a judgment in Goodson's favor on the defamation claim, enjoining RSLC–JFI's speech would violate the First Amendment because it would impermissibly restrain RSLC–JFI's ability to engage in free speech. Therefore, her request for a preliminary injunction is denied. *See id.* ("[W]hile the rule may temporarily delay relief for those ultimately found to be innocent victims of slander and libel, it prevents the unwarranted suppression of speech of those who are ultimately shown to have

committed no defamation, and thereby protects important constitutional values.").

It must also be noted that, in addition to the constitutional problems presented by Goodson's motion for a preliminary injunction, "courts have long held that equity will not enjoin a libel" absent exceptional or extraordinary circumstances. *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)); *see also Cmty. for Creative Non–Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987) ("The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.") (internal citation omitted). This is also the general rule in Arkansas. *See Esskay Art Galleries v. Gibbs*, 172 S.W.2d 924, 927 (Ark. 1943) ("[E]quity will not enjoin libelous or slanderous statements . . . ."); *Heuer v. Basin Park Hotel & Resort*, 114 F. Supp. 604, 609 (W.D. Ark. 1953). Therefore, a preliminary injunction is also denied because it is too early in this lawsuit to determine whether there are extraordinary circumstances supporting equitable relief.

Finally, the context of this case counsels against a preliminary injunction. At their core, the allegedly defamatory campaign advertisements concern political speech in the days leading up to an election. Because "debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution," *Buckley v. Valeo*, 424 U.S. 1, 14 (1976), imposing any prior restraint on election-related speech should be approached with extreme caution. The fact that the allegedly defamatory speech concerns the election strongly militates against granting injunctive relief because, again, it has not yet

been found that the speech is defamatory.

    B.    <u>Likelihood of Success on the Merits</u>

Goodson's motion for a preliminary injunction is also denied because the record does not indicate that she has a reasonable probability of succeeding on her defamation claim. *See Powell v. Ryan*, 855 F.3d 899, 902 (8th Cir. 2017).

To succeed on her defamation claim, Goodson must show: (1) the statements were defamatory; (2) the statements identify or reference her; (3) publication by RSLC–JFI; (4) RSLC–JFI's fault in the publication; (5) the statements are false; and (6) damages. *See Boellner v. Clinical Study Ctrs., LLC*, 378 S.W.3d 745, 757 (Ark. 2011).

Because she is a public official, Goodson would also have to show that RSLC–JFI made the statements with actual malice. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 356 (8th Cir. 1996). A statement is made with actual malice when it is made "with knowledge that it was false or with reckless disregard of whether it was false." *Sullivan*, 376 U.S. at 280. Reckless disregard for the truth requires more than a mere failure to investigate the issue before speaking. It requires a "high degree of awareness of . . . probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). Finally, in Arkansas, substantial truth, not exact truth, is a defense to a defamation claim. *Pritchard v. Times Sw. Broad. Inc.*, 642 S.W.2d 877, 879 (Ark. 1982).

*1. Gifts*

Goodson is unlikely to prove actual malice concerning RSLC–JFI's statements about

her trip to Italy and the contributions she has received from law firms.

As discussed above, this first type of allegedly defamatory statement is one that essentially suggests that Goodson accepted gifts from plaintiffs' lawyers in exchange for favorable rulings. These statements do not explicitly connect any particular gift with any specific ruling—they only do so by implication or omission. *See Pritchard*, 642 S.W.2d at 878; *Superior Fed. Bank v. Mackey*, 129 S.W.3d 324, 335 (Ark. Ct. App. 2003). Moreover, it is clear that Goodson accepted a trip to Italy from a trial lawyer, that her campaign received contributions from plaintiffs' law firms, and that she has made rulings favorable to plaintiffs. There was also some basis for RSLC–JFI to believe that these facts, and perhaps even the resulting implication, were true. *See Garrison*, 379 U.S. at 73–74. Although nothing presented so far proves that Goodson has a bias in favor of particular litigants or lawyers, she has the burden of proving, by clear and convincing evidence, that RSLC–JFI acted with actual malice when it made these allegedly defamatory statements. *See Mercer v. City of Cedar Rapids*, 308 F.3d 840, 849 (8th Cir. 2002). This is a very heavy burden to shoulder, and because each fact is true in isolation, it seems unlikely that she will be able to do so at trial.

### 2. Pay Raise

Goodson is unlikely to show that RSLC–JFI acted with actual malice when it created advertisements stating that she requested an $18,000 pay raise. Chief Justice Kemp requested a pay raise for all members of the Supreme Court after being authorized to do so by a confidential vote. Although RSLC–JFI did not confirm whether Goodson voted for the

raise before running the advertisements, nothing indicates it acted with actual malice when it assumed she supported the request. Indeed, nothing presented so far indicates RSLC–JFI made this statement knowing it to be false or that it was very likely false. Goodson's testimony, however, has now placed RSLC–JFI on notice that she voted against the raise.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction [Doc. No. 2] is denied.

IT IS SO ORDERED this 1st day of November 2018.

_____
UNITED STATES DISTRICT JUDGE